IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
AUSTIN CHAZ RAMSEY,           )
                              )
      Plaintiff,              )
                              )       CIVIL ACTION NO.
      v.                      )       3:09cv919-MHT
                              )            (WO)
ARNOLD GAMBER,                )
                              )
      Defendant.              )
```

OPINION

Plaintiff Austin Chaz Ramsey, a former football player at Auburn University, charges that defendant Arnold Gamber, a former athletic trainer at Auburn, failed to supervise his rehabilitation properly, in violation of state law.  Ramsey asserts three claims under Alabama law: negligence, wantonness, and 'interference with the physician-patient relationship.'  Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1332 (diversity).

The case is currently before the court on Gamber's motion for summary judgment in his favor on all of

Ramsey's claims.  For the reasons that follow, the motion will be granted.


## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

Ramsey became a scholarship football player for Auburn University in the fall of 2007.  He began playing

as a guard on the offensive line early in his freshman year.

In December 2007, Ramsey suffered a back injury while lifting weights.  Auburn University's athletic-program staff supervised Ramsey's rehabilitation with the goal of returning him to the football field.  Dr. Michael Goodlett was the primary coordinator for Ramsey's rehabilitation.  He worked closely with the athletic trainers and coordinated the rehabilitation of injured athletes.  Gamber was the head athletic trainer for Auburn's football team.  Gamber was responsible for evaluating and reporting football players' injuries to Dr. Goodlett.  He worked in conjunction with Dr. Goodlett and was required to follow Goodlett's medical instructions regarding athlete patients.  Finally, Kevin Yoxall was Auburn's strength and conditioning coach.  He supervised Auburn's weight-training room.

After physical therapy failed to relieve continuing pain in his leg, Ramsey underwent surgery on April 21,

3

2008, with Dr. Goodlett's approval.   Following the surgery it was determined that Ramsey would be allowed to gradually "increase his activities as tolerated with some [strength training]."   Def.'s Mot. Summ. J. Ex. 6 at 16 (doc. no. 66-6).

On May 29, Gamber, Dr. Goodlett, and Yoxall met to formulate a rehabilitation plan for Ramsey.   The plan was based on rehabilitation programs used by other players with similar back injuries.   It had a set progression: <u>Step 1</u> – running and jogging only, for two to three days; <u>Step 2</u> - running combined with exercises exclusively involving Ramsey's own body weight; <u>Step 3</u> - seated upper-body weight lifting and leg presses.   This progression would halt if Ramsey reported pain at any time.

When Dr. Goodlett left the May 29 meeting, he saw that Gamber and Yoxall "were putting together a written plan."   Def.'s Mot. Summ. J. Ex. 4, Goodlett Depo. at 87

4

(doc. no. 66-4).  On a later date, Dr. Goodlett saw a written plan "cut and pasted with notes."  Id. at 89.

In late May 2008, Ramsey began Step 1 of the rehabilitation plan by running and stretching for two days.  He reported no pain from these efforts.

On June 2, 2008, Ramsey began Step 2 of the plan with an initial session of jogging.  Ramsey then went to the weight room for an exercise known as a "one-legged box squat."  He was to perform this exercise by standing and extending one leg behind himself, placing it on a box; he was then to bend his supporting leg at the knee and hold the position.

An assistant to Yoxall instructed Ramsey to use free weights while performing the exercise.  Ramsey told the assistant that he believed he was not yet supposed to do any weighted exercises.  The assistant responded by saying: "[T]hey're on the list.  I don't know who made it up."  Def.'s Mot. Summ. J. Ex. 1, Ramsey Depo. at 152 (doc. no. 66-1).  Ramsey then put on a 50-pound weighted

vest and performed the exercise while holding 35-pound dumbbells in each hand.  As soon as Ramsey began the weighted box squats, he felt a tingling in his leg, similar to the pain he experienced when he first hurt his back in December 2007.  He stopped exercising.  Dr. Goodlett reexamined Ramsey and found that his right leg had returned to its condition prior to the corrective surgery.

As a result of the re-injury, Ramsey underwent a second back surgery on January 21, 2009.  He was then disqualified from his athletic scholarship due to concerns that long-term health difficulties could result if he continued playing football.  The injury, according to Ramsey, deprived him of a career as a professional football player.

### III. DISCUSSION

#### A.  Negligence and Wantonness

Ramsey charges that, on June 2, 2008, Gamber negligently and wantonly required him to perform exercises that exceeded Dr. Goodlett's instructions. Ramsey's negligence and wantonness claims fail for the following reasons.

First, there is no direct evidence that Gamber ordered weighted exercises for Ramsey.  Ramsey admits that it was the weight-room assistant, not Gamber, who orally instructed him to perform squats using free weights.

Second, Ramsey's theory that, because Gamber supervised athlete rehabilitation, Gamber is vicariously liable for the conduct of the weight-room assistant fails too.  Ramsey does not explicitly articulate the basis for this theory; he asserts simply that: "The chain of command was Dr. Goodlett to Gamber--Gamber to assistants like Yoxall. ... Gamber's duty was to formulate a safe,

7

written individualized plan that would be approved by Dr. Goodlett.  Then he also had the duty to assure that it was followed."  Pl.'s Resp. Def.'s Mot. Summ. J., Brief in Opp. at 25 (doc. no. 68).

This argument most closely resembles a respondeat-superior theory of liability.  "Under respondeat superior, a principal can be liable in tort for its agent's acts that are done within the scope of employment, either real or apparent, even though the principal did not authorize such acts or even expressly forbade them."  <u>Southern Life & Health Ins. Co. v. Turner</u>, 571 So. 2d 1015, 1017-18 (Ala. 1991), <u>judgment vacated on separate grounds</u>, <u>Southern Life & Health Ins. Co. v. Turner</u>, 500 U.S. 901, (1991), <u>reaffirmed on remand</u>, <u>Southern Life & Health Ins. Co. v. Turner</u>, 586 So. 2d 854 (Ala. 1991).  "He who relies upon the doctrine of respondeat superior ... has the burden of proving the relation of master and servant, principal and agent, etc."  <u>Alabama Power Co. v. Key</u>, 224 Ala. 286, 287 (Ala.

8

1932).   Ramsey  contends  that  there  was  "a  chain  of command"  because  Dr.  Goodlett  typically  communicated medical  instructions  first  to  Gamber,  who  then communicated those instructions to Yoxall.

The  record,  however,  does  not  support  Ramsey's contention that Gamber directed Yoxall or the weight room assistants.   To  the  contrary,  both  Gamber  and  Dr. Goodlett expressly stated that Gamber did not supervise Yoxall, <u>see</u> Def.'s Mot. Summ. J. Ex. 4, Goodlett Depo. at 130 (doc. no. 66-4); Def.'s Mot. Summ. J. Ex. 3, Gamber Depo. at 141 (doc. no. 66-3), and that Yoxall managed the weight  room  independently,  without  input  from  Gamber. <u>Id</u>. at 218 (testifying that Gamber "can't speak to how Coach Yoxall runs his weight room").   And there is no evidence in the record to refute this understanding of Gamber and Yoxall's relationship.   True, Gamber admitted that, if he and Yoxall differed regarding the exercises a  recovering  athlete  should  perform,  Gamber's  own recommendations would control over Yoxall's.   But there

9

is no evidence that the circumstances that led to Ramsey's re-injury resulted from a disagreement between Gamber and Yoxall.

Therefore, Gamber and the weight-room staff did not have the employment relationship necessary to hold Gamber liable for their conduct.  To incur respondeat-superior liability, a principal must "be deemed [a] master who has the supreme choice, control, and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work, but in all of its details."  Alabama Power Co. v. Key, 224 Ala. 286, 287 (Ala. 1932) (internal quotation marks and citation omitted).  There is no indication that Gamber had general, supervisory control over Yoxall, much less over Yoxall's assistants.  The fact that Gamber's rehabilitation instructions trumped Yoxall's in case of conflict does not establish that Yoxall acted as Gamber's servant.

Furthermore, even where supervisory authority exists, it does not automatically impose respondeat-superior liability. "[T]he doctrine of respondeat superior does not hold supervisors, as co-employees, vicariously liable for the torts of their subordinates. Supervisors lack the ability to willingly choose to enter into a relationship with their subordinates." Ware v. Timmons, 954 So. 2d 545, 555 (Ala. 2006) (declining to hold a supervising doctor liable for torts committed by a nurse practitioner). To be liable under a theory of respondeat superior, "an alleged employer not only must possess a right of control, but also must have voluntarily entered into the relationship, that is, had the right to choose--to select and to dismiss--the alleged servant." Id. at 553. Ramsey has offered no evidence that Gamber had any ability to select or dismiss Yoxall or the weight room assistants.[1]

---

1. Managers can be held directly liable for negligent supervision of subordinates. See, e.g., Big B, Inc. v. Cottingham, 634 So. 2d 999, 1003 (Ala. 1993).
(continued...)

11

Ramsey's final contention also fails: Ramsey argues that there is circumstantial evidence that Gamber added weighted box squats to the written rehabilitation plan. To support this conclusion, Ramsey relies on two facts: first, the unidentified weight-room assistant told Ramsey that weighted box squats were on a written list; and, second, the written rehabilitation plan was never produced in this case and remains missing. Ramsey contends that the missing document is evidence that Gamber destroyed or concealed it because it contained information damaging to him. According to Ramsey, one could conclude from the plan's absence, in conjunction

_____

1.   (...continued)
Here, Ramsey raised no claim for failure to supervise in his pleadings. Nor has Ramsey presented any evidence of Gamber's negligent supervision of any employee under his authority. "[T]he mere fact that an injury has occurred is not evidence of negligence and ... in negligent supervision cases negligence will not be found by inference." N.J. v. Greater Emanuel Temple Holiness Church, 611 So. 2d 1036, 1037 (Ala. 1992). Even if Ramsey had raised such a claim, it would likely be unavailing; the parties have testified that neither Yoxall nor his assistants were under Gamber's supervision.

with the assistant's statement, that Gamber ordered weighted squats and put them in the written rehabilitation plan, contrary to Dr. Goodlett's instructions.

As the court will explain below, Ramsey's argument fails for two reasons.

**The unidentified weight-room assistant's statement**: In his deposition, Ramsey testified that, when he asked why he was required to do weighted box squats, an unidentified weight-room assistant said: "[T]hey're on the list.  I don't know who made it up."  Def.'s Mot. Summ. J. Ex. 1, Ramsey Depo. at 152 (doc. no. 66-1). This statement is inadmissible hearsay.

"'[H]earsay' is a statement, other than one made by the declarant while testifying ... offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Unless the hearsay falls under one of the recognized exceptions (not applicable here) in the Federal Rules of Evidence, it is inadmissible.  Fed. R.

Evid. 802.   Typically, "inadmissible hearsay cannot be
considered on a motion for summary judgment."  <u>Macuba v.
DeBoer</u>, 193 F.3d 1316, 1322 (11th Cir. 1999) (quotation
marks and citation omitted).

Here, Ramsey's statement about what the unidentified
weight-room assistant said, in order to prove what was on
the exercise list, is hearsay.  The statement was made by
someone "other than ... the declarant while testifying"
(that is, made by the weight-room assistant rather than
Ramsey) and it is being "offered in evidence to prove the
truth of the matter asserted" (that is, that weighted box
squats were, in fact, on the assistant's exercise list).

Admittedly, "a statement by a party's agent or
servant" may be admissible as a party-admission. Fed. R.
Evid. 801(d).   However, this exception does not apply
here because the evidence, as explained above, does not
support the conclusion that the weight-room assistant was
an agent of Gamber.

14

Perhaps more importantly, aside from any hearsay issues, the assistant's statement about the exercise list simply does not prove what was on the rehabilitation plan that Ramsey says Gamber authored.  In referring to the list, the weight-room assistant states, "I don't know who made it up."  Def.'s Mot. Summ. J. Ex. 1, Ramsey Depo. at 152 (doc. no. 66-1). There is, therefore, no evidence in the record that Gamber was connected to, or responsible for, what was on the exercise list.  There is no evidence that this list was the same document as the written rehabilitation plan created by Gamber and Yoxall.  Nor is there any evidence that Gamber authored the portion of the document read by the assistant.  Therefore, even if the court were to consider the assistant's hearsay statement, it does not support the inference that Gamber ordered the weighted box squats. See City of Tuscaloosa v. Harcros Chems., 158 F.3d 548, 559 n.12 (11th Cir. 1998) (finding that a document notation could not be considered as evidence when the notation's author was not

15

identified and there was no record of the document's authentication).

The missing rehabilitation plan: Ramsey contends that the court should infer negligent or wanton conduct by Gamber because the written rehabilitation plan has not been produced in discovery.  He charges Gamber with spoliation, arguing that the absence of the document indicates that Gamber destroyed or lost the plan in order to conceal his misconduct.

"[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." Bashir v. AMTRAK, 119 F.3d 929, 931 (11th Cir. 1997).  "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case," Vick v. Texas Employment Com'n, 514 F.2d 734, 737 (11th Cir. 1975) (quoting McCormick, Evidence § 273 at 660-61 (1972), 31A C.J.S. Evidence § 156(2) (1964)); the party asking that an adverse inference be drawn against someone

must present "probative evidence" that that person "purposely lost or destroyed" the relevant materials. Bashir, 119 F.3d at 931.

Ramsey has not offered probative evidence that the written rehabilitation plan was lost or destroyed in bad faith by anyone, let alone Gamber.  Gamber was terminated from his position at Auburn University in January 2009 for reasons unrelated to this litigation, and he left behind all documents related to athletes at Auburn. These records did not belong to Gamber, and it would have been inappropriate for him to retain them.  There is no evidence whatsoever that Gamber retained documents related to athletes after he left Auburn or that he was in anyway responsible for the misplacement of the rehabilitation plan; nor is there any proof whatsover that Gamber destroyed any documents when he learned of Ramsey's suit in July 2009.  Ramsey has not only failed to provide any probative evidence that Gamber destroyed the rehabilitation plan in bad faith, he has failed to

produce any evidence that Gamber destroyed the plan at all.   Therefore, the court cannot draw the adverse inference against Gamber that Ramsey requests.

Because Ramsey has provided insufficient evidence to support his negligence and wantonness claims against Gamber, summary judgment is due to be granted on these claims.[2]


### B.  Interference with Physician-Patient Relationship

Ramsey asserts an additional claim of 'interference with a physician-patient relationship.'   The court is unaware of any Alabama statute or case law recognizing a claim for interference with the relationship between a

---

2.  In briefing, the parties contested whether Ramsey's claims were subject to the stricter standard required by the Alabama Medical Liability Act.  See 1975 Ala. Code §§ 6-5-480 to -488; 1975 Ala. Code §§ 6-5-541 to -552.  Gamber and Ramsey dispute whether this law applies to medical care provided by an athletic trainer. The court need not reach this question because, as the court has explained, Ramsey's claims fail under the lesser standard of negligence and wantonness.

patient and physician.[3]  Nor does such a cause of action

appear in the Restatement of Torts.  Indeed, while Ramsey

contends that Gamber's alleged conduct "would support a

cause of action under general tort principles," Pl.'s

Resp. Def.'s Mot. Summ. J., Brief in Opp. at 26 (doc. no.

68), he acknowledges that "there is no specific case law

on interference with the physician/patient relationship."

Id.

Nevertheless, the court need not reach the question

of whether such a claim exists, for Ramsey would not even

_____

3.  A cause of action exists under Alabama law for tortious interference with a contract or business relationship.  Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc., 850 So. 2d 259, 265 (Ala. 2002). However, in his complaint and in briefing Ramsey makes no reference to this tort or the elements required for a plaintiff to recover.  The elements of a claim for tortious interference with a contract are (1) the existence of a contract or business relation, (2) the defendant's knowledge of the contract or business relation, (3) intentional interference by the defendant with the contract or business, and (4) damage to the plaintiff as a result of the defendant's interference. Id.  An action by Ramsey for tortious interference would fail for the same reason his negligence and wantonness claims fail:  There is no evidence that Ramsey intentionally disrupted Dr. Goodlett's prescribed rehabilitation plan.

recover under the claim as he describes it.   In the pretrial conference in this case, Ramsey's counsel said the proposed tort would consist of three elements: (1) the existence of a doctor-patient relationship; (2) failure to carry out the doctor's orders by a person charged with executing those orders; and (3) complaint of the interference by the patient to the tortfeasor.   As discussed above, there is no evidence that Gamber failed to comply with the directives of Dr. Goodlett, and, if there were any interference, there is no indication that Ramsey ever complained of it to Gamber.

Summary judgment in favor of Gamber on Ramsey's claim of 'interference with a physician-patient relationship' is warranted.

* * *

Because Ramsey has failed to establish any genuine issues of material fact warranting a trial on any of his claims, summary judgment will be entered against him and

in favor of Gamber on all claims.   An appropriate

judgment will be entered.

     DONE, this the 7th day of February, 2011.


                               /s/ Myron H. Thompson
                          UNITED STATES DISTRICT JUDGE